NATIONAL BANK OF NORTH AMERICA, Plaintiff-Appellee,

v.

CINCO INVESTORS, INC., Aladino Ramos, Monserrate Ramos, Angelo Andello, and the United States Small Business Administrator, Defendants.

Appeal of UNITED STATES SMALL BUSINESS ADMINISTRATOR, Defendant.

No. 35, Docket 79–6067.

United States Court of Appeals, Second Circuit.

Argued Sept. 10, 1979.

Decided Oct. 30, 1979.

Edward N. Meyer, New York City (Cole & Deitz, New York City, of counsel), for plaintiff-appellee, National Bank of North America.

David M. Jones, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., for the Southern District of New York, Peter C. Salerno, Asst. U. S. Atty., New York City, of counsel), for defendant-appellant, Small Business Administrator.

Before LUMBARD, FRIENDLY and GURFEIN, Circuit Judges.

LUMBARD, Circuit Judge:

The United States Small Business Administrator appeals from a judgment against him[1] on a claim of breach of contract arising out of an alleged agreement to repay National Bank of North America ("NBNA"), the plaintiff below, for a loan NBNA made to Cinco Investors, Inc. ("Cinco"). After a nonjury trial before Judge Griesa in the Southern District of New York, defendant was held liable in the sum of $20,000. We reverse the judgment because the evidence does not support, as a matter of law, the conclusion that a contract existed between plaintiff and defendant.

NBNA brought suit on January 31, 1978, in state court against Cinco, Aladino Ramos, Monserrate Ramos and Angelo Andello; and against the SBA. The SBA secured

---

1. Hereafter we refer to the defendant-appellant as the Small Business Administration ("SBA").

removal of the suit to federal court under 28 U.S.C. § 1441. NBNA's suit involved three claims against Cinco and the individuals named above, its principals, all based on the bank's loan to Cinco. On October 18, 1978, a partial default judgment was entered against Cinco and against Aladino Ramos. At trial Andello was dismissed as a defendant, with NBNA's consent. Following trial on January 25 and 26, 1979, judgment was entered on February 7, 1979 against Monserrate Ramos and the SBA. This appeal concerns only NBNA's claim against the SBA.

In late 1975 Cinco was in need of funds for its restaurant business in Bay Shore, Long Island, and applied to the SBA for a loan. On October 14, 1975, the SBA conditionally authorized a loan to Cinco in the amount of $50,000. Because of the SBA's internal procedures, the money could not be made immediately available. Cinco met with a loan officer of NBNA, George Seher, late in October, 1975. Kenneth Senhouse, the SBA loan officer handling the Cinco matter, was also present. NBNA agreed to loan Cinco $20,000 on an interim basis.

On November 3, 1975, Seher wrote a letter to the SBA as follows:

Gentlemen:

This is to advise that, at your request, we have today loaned the subject [Cinco] the sum of $20,000.00 as interim aid pending your closing of the captioned Authorization.

It is our understanding that our loan is to be paid out of the proceeds of your loan to the subject at the time of closing. We would appreciate written concurrence in regard to the above.

Very truly yours,

George Seher (sig.) [2]

On the same day, November 3, 1975, NBNA disbursed the $20,000 to Cinco.

On November 11, 1975, the SBA sent a letter to Seher as follows:

Gentlemen:

In response to your letter dated November 3, 1975, we interpose no objection to your providing interim financing to the captioned subject [Cinco], and it is understood that this financing will be paid out from proceeds of our loan.

Very truly yours,

Martin Bass

Acting New York District Director

By: Donald Krause (sig.)

Supervisory Loan Specialist

Financing Division

On March 4, 1976, the SBA closed the $50,000 loan to Cinco. The SBA's closing attorney, Jack Matthews, gave Cinco a check for $24,000 at that time. This figure represented Cinco's expenditures as authorized to that date. The remaining $26,000 was disbursed to Cinco on March 26, 1976.

NBNA had been notified of the March 4 closing but chose not to attend. Other Cinco creditors were present.

After the closing, NBNA unsuccessfully sought repayment from Cinco and renewed the note. On June 2, 1976, NBNA wrote to the SBA telling it that Cinco had defaulted on the $20,000 loan and that NBNA considered the SBA to be liable on the loan. Over the next six months, a series of letters passed between the bank and the SBA, culminating in a meeting on January 11, 1977, at which the SBA's district director, Woodie Williams, was present.

Judge Griesa relied upon three factors in finding that such a contract existed between SBA and NBNA, binding the SBA to pay NBNA directly $20,000 when it closed the $50,000 loan to Cinco. First, he looked to Seher's letter of November 3, 1975, to establish the terms of the contract he found to have been formed when the SBA wrote its letter of November 11, 1975, agreeing to the bank's earlier letter. Second, Judge Griesa based his conclusion on the fact that Seher had decided not to attend the closing of the SBA loan, and that he did not take

---

**2.** Whether or not the loan to Cinco was indeed made at the SBA's "request", as asserted in this letter, was disputed at trial. The district court did not come to any finding on this point

and, in view of the grounds on which we dispose of this case, it is unnecessary for us to consider the matter.

any other steps to protect the bank at that time. Finally, Judge Griesa cited as a "crucial fact" the deposition testimony of Jack Matthews in response to a hypothetical question asking him what he would have done if the November 3 and 11 letters had been—as they were not—in the file transmitted to him, as the SBA closing attorney, from Senhouse, the SBA loan officer.

In his deposition, Matthews said that if his file had in fact contained the letters he would have asked the borrower to authorize the SBA to make out its $50,000 check as a joint payee instrument. Judge Griesa characterized Matthews' testimony as "in effect a statement that in his [Matthews'] view [the letters of November 3 and 11] did constitute an agreement by the SBA that it would pay the bank."

Judge Griesa noted that in response to essentially the same hypothetical question at trial Matthews answered differently, saying that had the letters been in his file he would have asked the SBA loan officer if there was an agreement to pay the bank directly; and that in his view the letters did not constitute such an agreement. Judge Griesa credited Matthews' deposition and not his trial testimony.[3]

■ The exchange of letters between the SBA and the bank did not create a contract because of the fatally ambiguous nature of the language used. The sentence, "It is our understanding that our loan is to be paid out of the proceeds of your loan to the subject at the time of closing", is not clear—it cannot be said whether NBNA is stating its expectation that Cinco will repay the loan out of monies received from the SBA (as the SBA maintains it understood the November 3 letter); or whether the NBNA is saying that it expects the $50,000 loan to include $20,000 to be paid directly to the bank (as the NBNA maintains). We cannot say that, considered objectively, the SBA's reading of the letter was unreason-

able. In the absence of any evidence showing that the SBA in fact interpreted the letter differently at the time, and in the absence of any testimony to show that the words as used by the parties had meaning as terms of art, we cannot agree with the trial court that the SBA ever became bound by a contractual obligation to NBNA.

The SBA's reply of November 11 does not supply the necessary quantum of illumination that might have resulted in formation of a contract: " . . . it is understood that this financing will be paid out from proceeds of our loan." The repetition of the phrase "paid out", and the avoidance, through the use of the passive voice, of any identification of who is to pay out, means that despite the apparent agreement there is no proof that the required mutual understanding as to terms existed.

■ The evidence relied upon by Judge Griesa to supplement the ambiguous documents is not sufficient. Seher's decision not to attend the SBA–Cinco closing or to take steps to arrange direct repayment is not a basis from which it can be inferred, as Judge Griesa did, that an agreement existed. Seher's conduct is also consistent with an understanding on his part that the SBA would protect the bank's interest. Furthermore, even if Seher's conduct can be taken to bear the full weight of the inferences adopted by Judge Griesa, all it shows is that one party—NBNA—thought that the terms of its November 3 letter meant direct reimbursement by the SBA. Such an interpretation still does not supply the essential counterpart necessary for a contract—an understanding on the SBA's part that such reimbursement had been proposed and agreed to.

■ Nor is Matthews' testimony enough to tip the scales. We credit, as the trial judge chose to, Matthews' deposition testi-

---

3. It should be noted that Seher's testimony was unavailable to Judge Griesa as Seher died before he could testify at trial or be deposed. Senhouse, the SBA loan officer with whom Seher had dealt, was not called as a witness by the SBA, though he had been deposed and portions of his deposition were read into the record. Judge Griesa stated at trial that the SBA's failure to call Senhouse as a witness would cause him to draw inferences adverse to the SBA.

mony only. But this merely establishes that if the letters had been in Matthews' file, he would have made out a joint payee check. Had Matthews made out such a check it does not follow that his actions would have made the SBA party to an enforceable contract. The SBA would still have been able to sue for the recovery of the $20,000 paid directly to NBNA, on the theory that one of its employees had erred. In such a suit a court would have to establish if the SBA had never become bound to pay out the $20,000 and Matthews' testimony that he paid the money would be irrelevant on the issue of liability.

Nor can Matthews' testimony be taken to establish that there was a contract on the theory that Matthews was the agent of the SBA. For there to have been a contract between the SBA and NBNA it had to have existed before the Cinco closing, when the alleged breach took place, and before the closing Matthews was not involved in the matter. His answer to a hypothetical question cannot supply the missing half of the required "meeting of the minds."

 Appellee argues that Judge Griesa's finding of a contract can be supported on two other grounds in the record. First, it argues that Senhouse admitted the existence of the contract to one of his SBA superiors, Walter Leavitt. Leavitt's testimony, given at deposition, was that he had a conversation with Senhouse at which Senhouse told him that NBNA was to be repaid out of the SBA loan to Cinco. This statement is as inconclusive as the November 3 letter and for the same reason—it fails to indicate whether NBNA is to be repaid by Cinco itself from the loan monies, or directly by the SBA at the time these monies are turned over to Cinco.

Second, appellee claims that the statements made by Seher at the conference held on January 11, 1977 support the Judge's finding below. These statements of Seher's come into the record as double hearsay. Robert Cox, an NBNA vice-presi-

dent, testified at trial that, at the 1977 meeting, Seher said that Senhouse told him, in 1975, that the SBA "would protect [the bank's] interest at the closing and repay us the $20,000." This is the only unambiguous evidence in the record to support the view that the SBA understood that it had undertaken an obligation to reimburse NBNA for the $20,000 directly and at the closing.

Appellant objected to Cox's testimony at trial as hearsay. Plaintiff-appellee's attorney stated that Cox's account of what Seher had said Senhouse had said was admissible as an adoptive admission. Judge Griesa apparently never ruled on the objection, and he did not rely on Cox's testimony—or Seher's statement within it—in his decision.[4]

Federal Rule of Evidence 801(d)(2)(B) codifies the doctrine of adoptive admissions, requiring that the statement be one "of which [the party-opponent] has manifested his adoption or belief in its truth." Here the only conduct by the SBA that can be interpreted as a manifestation of its belief in the truth of Seher's statement is testimony by Cox that the SBA regional director, Williams, responded to Seher's statement by saying, in effect, that the SBA had mishandled the matter. In his testimony at trial, Williams denied he had said that the SBA had mishandled the matter.

 It is thus unclear on the record before us whether or not Senhouse's statement is or should be in evidence. The tangled evidentiary issues raised need not be unraveled in their full complexity, however. Assuming arguendo that the SBA district director said what plaintiff-appellee contends he said, it would nonetheless not be an adoptive admission. A general admission that the matter had been mishandled by the SBA is not enough to support the conclusion that Williams believed the SBA had bound itself, via Senhouse's conversation with Seher, to reimburse NBNA. Other statements Williams made at the same

4. Judge Griesa found that the evidence he did admit relating to correspondence and meetings between NBNA and the SBA during the June, 1976 to February, 1977 period was "inconclusive," and he did not rely on such evidence in reaching any of his conclusions.

meeting (for example, that he would have to consult with other members of his staff in order to determine what had happened) indicate that his own mind was not made up as to the truth or falsity of Seher's statement. We conclude that Cox's testimony regarding Seher's report of his conversation with Senhouse should not be considered. There is insufficient evidence in the record before us to sustain the district court's conclusion of law that a contract existed.

Reversed.